# UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF FLORIDA
### JACKSONVILLE DIVISION

MICHAEL EUGENE WILLIAMS,

              Petitioner,

v.                            Case No.: 3:19-cv-1478-MMH-LLL
                                     3:16-cr-153-MMH-LLL

UNITED STATES OF AMERICA,

              Respondent.

_____

# ORDER

Petitioner Michael Eugene Williams moves to vacate his conviction and sentence under 28 U.S.C. § 2255. (Civ. Doc. 1, § 2255 Motion; Civ. Doc. 2, Memorandum; Civ. Doc. 3-1, Williams's Affidavit.)[1] Williams pled guilty to one count of sex trafficking of a child and was sentenced to life imprisonment. He challenges his guilty plea based on the alleged ineffectiveness of his counsel. The government responded in opposition (Civ. Doc. 6, Response) and Williams replied (Civ. Doc. 7, Reply). Thus, the case is ripe for a decision.

Under 28 U.S.C. § 2255 and Rule 8(a) of the Rules Governing Section 2255 Proceedings[2], the Court has considered the need for an evidentiary hearing and

---

[1]     "Civ. Doc. ___" refers to docket entries in the § 2255 case, No. 3:19-cv-1478-MMH-LLL. "Crim. Doc. ___" refers to docket entries in the criminal case, No. 3:16-cr-153-MMH-LLL.

[2]     Rule 8(a) of the Rules Governing Section 2255 Proceedings expressly requires the Court to review the record, including any transcripts and submitted materials, to determine whether an evidentiary hearing is warranted before resolving a § 2255 motion.

determines that a hearing is unnecessary to resolve the motion. No evidentiary hearing is required because Williams's allegations are affirmatively contradicted by the record, patently frivolous, or even assuming the facts he alleges are true, he still would not be entitled to relief. <u>Rosin v. United States</u>, 786 F.3d 873, 877 (11th Cir. 2015); <u>see also</u> <u>Patel v. United States</u>, 252 F. App'x 970, 975 (11th Cir. 2007).[3]

## I.   Background

In May 2016, the Jacksonville Sheriff's Office (JSO) received a tip from the National Center for Missing and Exploited Children that several child pornography files had been uploaded to a Google Drive associated with Williams. (Crim. Doc. 39, Presentence Investigation Report [PSR] ¶ 18.)[4] A JSO detective reviewed the files and found that they contained six images and five videos of child pornography, all involving the same victim. <u>Id.</u> Further investigation revealed that the internet protocol address, subscriber information, Google account, and cell phone number associated with that account resolved to Williams or his home address in Jacksonville, Florida. <u>Id.</u>

---

[3]     The Court does not rely on unpublished opinions as binding precedent; however, they may be cited in this Order when the Court finds them persuasive on a particular point. <u>See</u> <u>McNamara v. GEICO</u>, 30 F.4th 1055, 1060–61 (11th Cir. 2022); <u>see generally</u> Fed. R. App. P. 32.1; 11th Cir. R. 36–2 ("Unpublished opinions are not considered binding precedent, but they may be cited as persuasive authority.").

[4]     Williams did not contest the accuracy of the factual statements in the PSR. (Crim. Doc. 61, Sentencing Transcript at 4.)

On July 5, 2016, a Duval County Circuit Court judge issued a warrant to search Williams's residence, which law enforcement officers executed two days later. Id. ¶ 19. While executing the search warrant, Williams agreed to an interview, but he ended it once officers asked him about his email account. Id. Among other items, law enforcement seized an LG cellphone and an LG tablet computer from the residence. Id.

Forensic analysis of Williams's devices revealed 453 images and five videos of child pornography, many depicting the graphic sexual abuse of infants and toddlers. Id. ¶ 20. Forensic analysis of the cell phone also revealed text messages and email conversations between Williams and an unknown woman (later identified as LLS), which spanned January 19, 2016, to July 7, 2016 (the date the search warrant was executed). Id. ¶ 21. During the conversations, Williams repeatedly requested that LLS produce child pornography of her then-three-year-old daughter and offered to pay LLS for the images and videos he sought. Id. According to Western Union records, Williams sent LLS sixteen wire transfers between June 30, 2015, and June 24, 2016, totaling $635. Id. Williams also emailed one video LLS had sent him to another individual. Id. Williams urged LLS to engage in graphic sex acts with her child and to have her child perform sex acts on others, including the child's father. Id. ¶¶ 22–23.

Upon discovery of the child victim, Florida law enforcement contacted the authorities in Texas. Id. ¶ 24. In October 2016, Texas law enforcement arrested

LLS and removed the child victim from the home. Id. During an interview with law enforcement, LLS revealed that she had been in touch with Williams via Kik Messenger and that she had communicated with him as recently as September 2016. Id. Additional Western Union records reflected that Williams had sent LLS three more wire transfers totaling $110 in August and September 2016. Id.

On October 20, 2016, Homeland Security Investigations (HSI) obtained a federal warrant to search Williams's residence, which HSI officers executed the next day. Id. ¶ 25. Law enforcement arrested Williams while executing the federal search warrant, and Williams declined to make a statement at that time. Id. ¶ 28. During this search, law enforcement seized (among other items) another LG cellphone. Id. ¶ 25. Forensic analysis of the second phone revealed that it was activated on July 12, 2016—five days after execution of the first search warrant. Id. ¶ 26. Williams kept communicating with LLS between July 12, 2016, and October 2, 2016. Id. Williams warned LLS that JSO was investigating him and not to send photos of the child victim to anyone. Id. Forensic analysis of Williams's second phone revealed another 22 images and at least one video of child pornography. Id. ¶ 27. The video depicted the same child victim being sexually abused by LLS (at Williams's urging). See id. Williams told LLS he gratified himself to the video and asked her to send him a longer recording. Id.

A federal grand jury returned an eight-count Indictment against Williams following his arrest. (Crim. Doc. 9, Indictment.) The grand jury charged Williams with one count of producing child pornography (Count One), one count of sex trafficking of a child under the age of fourteen (Count Two), three counts of publishing a notice seeking child pornography (Counts Three through Five), one count of transporting child pornography (Count Six), and two counts of receiving child pornography (Counts Seven and Eight). Id.

After being indicted, Williams submitted to an interview and polygraph examination with a United States Secret Service Agent. PSR ¶ 28. In his counsel's presence, Williams signed forms waiving his rights and consenting to the examination. Id. During the interview and examination, Williams admitted that he had been viewing, downloading, and sharing images of child pornography since 2014, following a divorce and his release from jail. Id. ¶ 29. Williams said that he met LLS through a "swingers" website. Id. He confessed that he solicited LLS to engage in sexually explicit conduct with the child victim and to produce material of such conduct. Id. Williams admitted to paying LLS about $500 during the nearly one-year period when LLS was producing these images. Id. Williams also admitted that he shared a video of the child victim being sexually abused with another person he had met on the "swingers" website. Id.

A month later, Williams pled guilty to Count Two of the Indictment—sex trafficking of a child under the age of fourteen, in violation of 18 U.S.C. §§ 1591(a) and 1594—under a written Plea Agreement. (Crim. Doc. 29, Plea Agreement; Crim. Doc. 69, Change-of-Plea Transcript.) Following a change-of-plea colloquy before a United States Magistrate Judge, the Magistrate Judge recommended that "[a]fter cautioning and examining [Williams] under oath concerning each of the subjects mentioned in Rule 11, I determined that the guilty plea was knowledgeable and voluntary, and that the offense charged is supported by an independent basis in fact containing each of the essential elements of such offense." (Crim. Doc. 30, Report and Recommendation to Accept Guilty Plea.) The Court accepted Williams's guilty plea without objection and adjudicated him accordingly. (Crim. Doc. 32, Acceptance of Plea.)

A United States Probation Officer calculated Williams's advisory guidelines sentencing range to be life imprisonment. PSR ¶ 85. That calculation was based on a total offense level of 50 (which maxed out at 43 under U.S.S.G. § 5A) and a Criminal History Category of III. See id. ¶¶ 36–48, 55. The Court adopted the factual statements and guidelines calculation in the PSR without objection. Sentencing Tr. at 4, 5–6. After hearing arguments from both parties, testimony from two witnesses about the victim's abuse, and a statement by Williams, the Court sentenced Williams to a term of life imprisonment. Id. at 99; see also id. at 89–99 (explanation of sentence); (Crim. Doc. 48, Judgment.)

Williams filed a notice of appeal. On direct appeal, his attorney filed a brief under <u>Anders v. California</u>, 386 U.S. 738 (1967), and moved to withdraw. <u>United States v. Williams</u>, 739 F. App'x 596, 596 (11th Cir. 2018). After an independent review of the record, the Eleventh Circuit found "no arguable issues of merit" and affirmed Williams's conviction and sentence. <u>Id.</u>

Williams did not petition the Supreme Court for certiorari review. These § 2255 proceedings timely followed.

## II.   Governing Law

Under Title 28, United States Code, § 2255, a person in federal custody may move to vacate, set aside, or correct his sentence. Section 2255 permits collateral relief on four grounds: (1) the sentence was imposed in violation of the Constitution or laws of the United States; (2) the court lacked jurisdiction to impose the sentence; (3) the imposed sentence exceeded the maximum authorized by law; or (4) the imposed sentence is otherwise subject to collateral attack. 28 U.S.C § 2255(a). Only jurisdictional claims, constitutional claims, and claims of error that are so fundamentally defective as to cause a complete miscarriage of justice will warrant relief through collateral attack. <u>United States v. Addonizio</u>, 442 U.S. 178, 184–86 (1979); <u>Spencer v. United States</u>, 773 F.3d 1132, 1138 (11th Cir. 2014) (en banc) ("[A] district court lacks the authority to review the alleged error unless the claimed error constitute[s] a fundamental defect which inherently results in a complete miscarriage of justice." (internal

7

quotation marks omitted)). The Supreme Court has recognized that a petitioner's claim that he received ineffective assistance of counsel in violation of the Sixth Amendment is properly brought in a collateral proceeding under § 2255. Massaro v. United States, 538 U.S. 500, 504 (2003).

To establish ineffective assistance of counsel, a § 2255 petitioner must demonstrate both: (1) that his counsel's conduct amounted to constitutionally deficient performance, and (2) that counsel's deficient performance prejudiced his defense. Strickland v. Washington, 466 U.S. 668, 687 (1984); Martin v. United States, 949 F.3d 662, 667 (11th Cir. 2020). In determining whether the petitioner has satisfied the first requirement, that counsel performed deficiently, the Court adheres to the standard of reasonably effective assistance. Weeks v. Jones, 26 F.3d 1030, 1036 (11th Cir. 1994) (citing Strickland, 466 U.S. at 688). The petitioner must show, in light of all the circumstances, that counsel's performance fell outside the "wide range of professionally competent assistance." Scott v. United States, 890 F.3d 1239, 1258 (11th Cir. 2018) (internal quotation marks and citation omitted). In other words, "[t]he standard for effective assistance of counsel is reasonableness, not perfection." Brewster v. Hetzel, 913 F.3d 1042, 1056 (11th Cir. 2019) (citing Strickland, 466 U.S. at 687). To satisfy the second requirement, that counsel's deficient performance prejudiced the defense, the petitioner must show a reasonable probability that, but for counsel's error, the result of the proceeding would have been different.

8

Martin, 949 F.3d at 667 (citing Padilla v. Kentucky, 559 U.S. 356, 366 (2010)). In determining whether a petitioner has met the two prongs of deficient performance and prejudice, the Court considers the totality of the evidence. Strickland, 466 U.S. at 695. However, because both prongs are necessary, "there is no reason for a court… to approach the inquiry in the same order or even to address both components of the inquiry if the defendant makes an insufficient showing on one." Id. at 697.

A § 2255 movant "bears the burden to prove the claims in his § 2255 motion." Rivers v. United States, 777 F.3d 1306, 1316 (11th Cir. 2015); see also Beeman v. United States, 871 F.3d 1215, 1221–23 (11th Cir. 2017). If "the evidence does not clearly explain what happened … the party with the burden loses." Beeman, 871 F.3d at 1225 (internal quotation marks and citation omitted). Moreover, a § 2255 movant is not entitled to a hearing, much less relief, "when his claims are merely conclusory allegations unsupported by specifics or contentions that in the face of the record are wholly incredible." Tejada v. Dugger, 941 F.2d 1551, 1559 (11th Cir. 1991) (citation omitted).

## III.   Discussion

Williams raises a single ground for relief in his § 2255 Motion and Memorandum. He alleges that his guilty plea resulted from the "gross misadvice" of his attorney—Assistant Federal Public Defender Lisa Call—rendering his guilty plea "unknowing, unintelligent, and involuntary."

Memorandum at 2; <u>see also</u> <u>id.</u> at 7–15. He asserts that "[c]ounsel assured Mr. Williams that he would receive a sentence of 15 years' imprisonment if he pleaded guilty," <u>id.</u> at 7, which is the mandatory minimum sentence for sex trafficking of a child under the age of fourteen, <u>see</u> 18 U.S.C. § 1591(b)(1). Williams contends that counsel's advice "grossly under[-]represented Mr. Williams' advisory guideline range of imprisonment—which, based on the relevant conduct known to counsel [at the time] triggered a range of Life imprisonment—, and constituted deficient performance." Memorandum at 2; <u>see also</u> <u>id.</u> at 7–9. Relatedly, Williams alleges that "[c]ounsel was also deficient for failing to provide an accurate assessment of the sentencing exposure Mr. Williams would face under a plea versus following his conviction at trial." <u>Id.</u> at 11.

Williams asserts that "[b]ut for [counsel's] misadvice, [he] would have persisted in his plea of not guilty and exercised his right to trial by jury." <u>Id.</u> at 2. He contends that he "only pleaded guilty as a result of counsel's misadvice which convinced him that accepting the plea would limit his sentence exposure to 15 years' imprisonment, and would foreclose the possibility of the Life sentence which counsel assured him would result from proceeding to trial." <u>Id.</u> at 12. Williams asserts that had he known his Guidelines imprisonment range would be Life imprisonment, he would not have pled guilty. <u>Id.</u> at 12–13. He also asserts that "[t]his reality finds additional support in Mr. Williams'

reluctance to plead guilty and his belief that he was and is innocent of the offense to which counsel convinced him to plead guilty." Id. at 14; see also Williams's Affidavit ¶ 3 ("Although I expressed to AFPD Call my belief that I was innocent of this offense, AFPD Call assured me that the guilty plea was my best option and would result in imposition of a sentence of 15 years' imprisonment.").

Williams makes similar allegations in his Affidavit (Civ. Doc. 3-1). He adds that his counsel "exert[ed] pressure on [him] to plead guilty." Id. ¶ 4. He contends "[t]here is no way" he "would have pleaded guilty to a crime [he] didn't even commit, had it not been for the lies told to [him] by AFPD Call." Id. ¶ 6.

The government responds that this claim is procedurally defaulted because Williams could have challenged the voluntariness of his guilty plea on direct appeal and he failed to do so. See Response at 9–16. The government also argues that the claim fails on the merits because it is refuted by Williams's sworn statements during the change-of-plea colloquy. Id. at 16–21.[5]

---

[5]    The Court rejects the government's argument that this claim is procedurally defaulted. Generally, the Eleventh Circuit does not address ineffective assistance claims on direct appeal. See United States v. Patterson, 595 F.3d 1324, 1328–29 (11th Cir. 2010). And even if the record on direct appeal "contains some indication of deficiencies in counsel's performance," the Supreme Court instructs that "a motion brought under § 2255 is preferable to direct appeal for deciding claims of ineffective assistance." Massaro, 538 U.S. at 504. Thus, the Supreme Court has held "that failure to raise an ineffective-assistance-of-counsel claim on direct appeal does not bar the claim from being brought in a later, appropriate proceeding under § 2255." Id. at 509. That said, while Williams's ineffective assistance claim is not procedurally defaulted, the Court finds that it fails on the merits.

11

### A. Williams's ineffective assistance claim fails on the merits

Strickland's two-part framework "applies to challenges to guilty pleas based on ineffective assistance of counsel." Hill v. Lockhart, 474 U.S. 52, 57 (1985). First, a petitioner "must show that counsel's representation fell below an objective standard of reasonableness." Id. at 57 (quoting Strickland, 466 U.S. at 687–88). "[U]nder certain circumstances, misadvice about the sentencing consequences of pleading guilty may constitute deficient performance." Riolo v. United States, 783 F. App'x 917, 922 (11th Cir. 2019). Second, in the context of a guilty plea, a petitioner "can show prejudice only if 'there is a reasonable probability that, but for counsel's errors, he would not have pleaded guilty and would have insisted on going to trial.'" Winthrop-Redin v. United States, 767 F.3d 1210, 1219 (11th Cir. 2014) (quoting Hill, 474 U.S. at 59). But "[c]ourts should not upset a plea solely because of post hoc assertions from a defendant about how he would have pleaded but for his attorney's deficiencies. Judges should instead look to contemporaneous evidence to substantiate a defendant's expressed preferences." Lee v. United States, 137 S. Ct. 1958, 1967 (2017).

The record refutes Williams's allegations that Ms. Call promised him he would be sentenced to 15 years in prison if he pled guilty or that Ms. Call failed to advise him of his guidelines sentencing exposure. At the change-of-plea colloquy, Williams took an oath to tell the truth under penalty of perjury. Plea Tr. at 2–3. Williams affirmed he had read and understood the entire Plea

Agreement, discussed it with his attorney, and signed each page. Id. at 20–21. He said that he understood the consequences of pleading guilty to Count Two of the Indictment, including the applicable mandatory minimum and maximum penalties, which ranged from 15 years to life in prison. Id. at 18–20. He expressed no alarm when the Court cautioned him he could be sentenced to life in prison following his guilty plea.

Williams stated that he understood his sentence could not be predicted (other than that it would fall between the mandatory minimum and maximum penalties), and that he knew his sentence could be harsher than anything his attorney might have estimated. See id. at 15–16. The Magistrate Judge addressed the sentencing guidelines and the unpredictability of the sentence:

> THE COURT: All right. The federal sentencing guidelines apply to your case. The guidelines are a set of rules that help the district judge arrive at the appropriate sentence in your case.
>
> I know from reviewing the plea agreement—at least I think I know—that Ms. Call must have explained and discussed the sentencing guidelines with you because there are a number of references to the guidelines in your plea agreement.
>
> But let me confirm that with you. Has she explained the guidelines to you?
>
> [WILLIAMS]: Yes, Your Honor.
>
> THE COURT: All right. I won't go into great detail about them, but I have to cover certain things about the sentencing process.

The district  judge will not be able to determine your guideline sentence until after the presentence report has been completed by the probation office.

After it has been determined what guidelines apply to your case, the district judge has the authority to impose a sentence that is more severe or less severe than the sentence called for by the guidelines. Of course, this is subject to the mandatory minimum term of imprisonment called for in this case.

The district judge under certain circumstances has the authority to depart or vary from the guidelines and sentence you either to a lower sentence or a higher sentence than the one called for by the guidelines, again, subject to the mandatory minimum term of imprisonment that's required in this case.

The district judge must consider the guidelines but has the authority to impose any sentence up to and including the maximum penalty permitted by law.

This means that the district judge is not bound by the guidelines in sentencing you; instead, the guidelines are only advisory.

***

The sentence imposed in your case, Mr. Williams, may be different than any estimated sentence that Ms. Call or anyone else has given you. In fact, your sentence could be more severe than you expect. If that happens, you will still be bound by your guilty plea and you will not have a right to withdraw it.

Do you understand that sir?

[WILLIAMS]:        Yes, Your Honor.

THE COURT:        Do you understand all of the things I've just explained to you about sentencing?

[WILLIAMS]:        Yes, sir.

THE COURT:        Do you have any questions about the guidelines?

14

[WILLIAMS]:        No, sir.

Id. at 14–16 (emphasis added). Thus, Williams affirmed that Ms. Call had discussed the federal sentencing guidelines with him, and he understood that the district judge could not determine his guidelines range until the Probation Office completed a presentence report. He also accepted that the Court could impose the maximum penalty, and that he would remain bound by his guilty plea even if his sentence were harsher than he expected. Indeed, later at the sentencing hearing, Williams confirmed he had reviewed the PSR, which contained a guidelines sentencing range of life imprisonment. Sentencing Tr. at 4. Still, neither he nor his counsel objected to the guidelines calculation, id., nor did Williams express any surprise at the guidelines range or any desire to withdraw his guilty plea, see id. at 86–87. Instead, he "accept[ed] … responsibility for the horrible actions and decisions [he] made," talked about the circumstances he thought led him to commit the crime, and asked the Court to consider his age and physical conditions. Id.

    During the change-of-plea colloquy, Williams confirmed that he entered his guilty plea freely and voluntarily, that it was his own choice, and that nobody had threatened, forced, coerced, or intimidated him into doing so. Plea Tr. at 30. He also denied that anyone had promised him any benefits or a light sentence in exchange for his plea:

| | |
|---|---|
| THE COURT: | Has anyone made any promises or assurances to you of any kind to induce you to plead guilty, other than those stated in your plea agreement? |
| [WILLIAMS]: | <u>No, sir.</u> |
| THE COURT: | At this time, Mr. Williams, do you know specifically what sentence you will receive? |
| [WILLIAMS]: | <u>Not specifically, no.</u> |
| THE COURT: | Has anyone promised you that you will receive a light sentence or be otherwise rewarded by pleading guilty other than what is stated in the plea agreement? |
| [WILLIAMS]: | <u>No, Your Honor.</u> |

<u>Id.</u> at 30–31 (emphasis added). Ms. Call and the prosecutor gave similar assurances to the Court. <u>Id.</u> at 31.

Williams also affirmed he had told the truth during the change-of-plea hearing and denied that anyone had coached him on what to say. <u>Id.</u> at 32. Williams said he was satisfied with Ms. Call's representation, that he had been given enough time to talk to her about the case, and that he had no complaints about his representation or how he had been treated. <u>Id.</u> at 31–32. Williams reaffirmed that it was his own decision to plead guilty to Count Two of the Indictment, <u>id.</u> at 32, and he agreed with the finding that his decision was knowing and voluntary, <u>id.</u> at 33–34.

Thus, Williams made specific, sworn statements throughout the change-of-plea colloquy that refute his allegations that Ms. Call pressured him to plead guilty or falsely promised him he would be sentenced to 15 years in prison if he

did so.[6] His statements also refute the allegation that Ms. Call failed to discuss the sentencing guidelines with him. And even if Ms. Call <u>did</u> fail to discuss the guidelines or other sentencing contingencies, his sworn statements demonstrate his willingness to plead guilty despite knowing that his guidelines range and final sentence could not be predicted, that he could be sentenced to life in prison, and that he would be bound by his guilty plea even if his sentence were harsher than expected. Thus, Williams cannot show a reasonable probability he would not have pled guilty and would have gone to trial even had he known his guidelines range would be life imprisonment. <u>See</u> <u>Hill</u>, 474 U.S. at 59; <u>see also</u> <u>United States v. Wilson</u>, 245 F. App'x 10, 11–12 (11th Cir. 2007) ("[E]ven if Wilson's counsel was in some way deficient in advising Wilson of the possible sentencing implications from his guilty plea, Wilson cannot establish prejudice. During the plea colloquy, the district court itself explained to Wilson—in detail—the consequences of the plea agreement, range of punishment, and sentencing contingencies before accepting Wilson's guilty plea. Thus, any failure on the part of Wilson's counsel to clearly explain the

---

[6]     While not dispositive, the Court is familiar with Ms. Call, who is an experienced Assistant Federal Public Defender and who has practiced before this Court for many years. The allegation that she would promise a client that he would receive the mandatory minimum if he pled guilty, or pressure the client to plead guilty, strains credulity. <u>See</u> <u>Chandler v. United States</u>, 218 F.3d 1305, 1316 (11th Cir. 2000) (en banc) ("When courts are examining the performance of an experienced trial counsel, the presumption that [her] conduct was reasonable is even stronger."); <u>see also</u> <u>id.</u> at 1316 n.19 (in an opinion rejecting an ineffective assistance claim, reciting defense attorney's credentials and reputation in the community (citing <u>Burger v. Kemp</u>, 107 S. Ct. 3114, 3118 (1987))).

possible punishment was cured by the district court.").

In support of his claim that he would have gone to trial but for counsel's alleged misadvice, Williams contends he was already reluctant to plead guilty because he believed he was innocent. Memorandum at 14; see also Williams's Affidavit ¶ 3. The record discredits this claim. Before he even pled guilty, Williams submitted to an interview and a polygraph examination with a Secret Service Agent. PSR ¶ 28. In that interview, he admitted that he had been downloading and sharing child pornography since 2014, that he solicited LLS to produce material of her three-year-old daughter engaged in sexually explicit conduct, and that he paid LLS about $500 over nearly a year while LLS was producing these images. Id. ¶ 29. Forensic evidence from Williams's devices revealed videos and images of child pornography—including videos of the child victim—as well as explicit messages from Williams to LLS about producing such videos. Id. ¶¶ 20–23, 26–27. Western Union records confirmed that Williams had made several wire transfers to LLS totaling over $700. Id. ¶¶ 21, 24. And in an interview with Texas authorities, LLS confirmed that Williams had paid her to produce and send him images of the child victim's sexual abuse. Id. ¶ 24. When Williams pled guilty to Count Two of the Indictment, he affirmed that he was pleading guilty because he was in fact guilty, and that the factual basis supporting the guilty plea was true and correct. See Plea Tr. at 28–30; see also Plea Agreement at 19–22. At sentencing, Williams made no assertion of

innocence, but instead "accept[ed his] responsibility for the horrible actions and decisions [he] made." Sentencing Tr. at 86. Thus, the record refutes Williams's newly minted claim that he was reluctant to plead guilty because he thought he was innocent.

Williams also contends that Ms. Call gave ineffective assistance by failing to "provide an accurate assessment of the sentencing exposure Mr. Williams would face under a plea versus following his conviction at trial." Memorandum at 11. The Court assumes, for the sake of discussion, that counsel had a duty to give Williams a comparative analysis of his sentencing exposure if he were convicted at trial compared to a conviction under his Plea Agreement. The Court also assumes that counsel did not provide Williams that analysis. Still, Williams fails to show prejudice under Strickland and Hill.

Williams knew what his sentencing exposure would be had he gone to trial because the Court advised him of all the charges and their penalties at his detention and arraignment hearing. (Crim. Doc. 11, Minute Entry of Detention and Arraignment Hearing.) The Court would have advised him of the following minimum and maximum penalties: for the production of child pornography (Count One), fifteen to thirty years' imprisonment, 18 U.S.C. §§ 2251(a), (e); for sex trafficking of a child under the age of fourteen (Count Two), fifteen years' to life imprisonment, 18 U.S.C. § 1591(b)(1); for each count of publishing a notice seeking child pornography (Counts Three through Five), fifteen to thirty years'

imprisonment, 18 U.S.C. §§ 2251(d), (e); and for each count of transporting or receiving child pornography (Counts Six through Eight), five to twenty years' imprisonment, 18 U.S.C. §§ 2252(a)(1), (b)(1). An accurate assessment of Williams's sentencing exposure had he gone to trial would have accounted for the possibility that (1) he could be convicted on every count, (2) the Court could impose the maximum sentence for each count, and (3) the Court could run each sentence consecutively. Thus, Williams's maximum sentencing exposure, had he gone to trial, would have been life plus 180 years' imprisonment.

Williams fails to explain how it would have caused him to reject the Plea Agreement and go to trial had Ms. Call informed him that he faced up to life plus 180 years' imprisonment by going to trial. That is especially true given that the Plea Agreement at least secured promises from the government to (1) request dismissal of seven of the eight counts in the Indictment and (2) to recommend a three-level guidelines reduction for acceptance of responsibility. See Plea Agreement at 3, 4–5. Given the sentencing risks and contingencies that Williams acknowledged during his change-of-plea colloquy and his demeanor at sentencing—where he accepted responsibility and did not object to his guidelines range of life imprisonment—he fails to show a reasonable probability that he would not have pled guilty and would have gone to trial had counsel advised him of his sentencing exposure under a conviction at trial compared to a conviction under the Plea Agreement. See Hill, 474 U.S. at 59.

20

In addition to the fact that the record is replete with evidence contradicting his allegations, Williams fails to point to any "contemporaneous evidence to substantiate" his claim that he would have rejected the Plea Agreement and gone to trial if not for the deficiencies he alleges against Ms. Call. <u>Lee</u>, 137 S. Ct. at 1967. Without such contemporaneous evidence, Williams cannot succeed on his claim because "<u>post hoc</u> assertions … about how he would have pleaded but for his attorney's deficiencies" are not enough to upset a plea. <u>Id.</u> As a result, relief on his claim is due to be denied.

## B. No evidentiary hearing is warranted

A § 2255 movant is entitled to an evidentiary hearing if he "alleges facts that, if true, would entitle him to relief." <u>Aron v. United States</u>, 291 F.3d 708, 715 (11th Cir. 2002) (citation omitted). "[A] petitioner need only allege—not prove—reasonably specific, non-conclusory facts that, if true, would entitle him to relief." <u>Id.</u> at 715 n.6. "However, a district court need not hold a hearing if the allegations are patently frivolous, based upon unsupported generalizations, or affirmatively contradicted by the record." <u>Winthrop-Redin</u>, 767 F.3d at 1216 (internal quotation marks and citations omitted).

Williams is not entitled to a hearing because his allegations are conclusory and refuted by the record. "More often than not a prisoner has everything to gain and nothing to lose from filing a collateral attack upon his guilty plea." <u>Blackledge v. Allison</u>, 431 U.S. 63, 71 (1977). Thus, when "a

defendant makes statements under oath at a plea colloquy, he bears a heavy burden to show his statements were false." United States v. Rogers, 848 F.2d 166, 168 (11th Cir. 1988). Williams does not meet that burden. His signed Plea Agreement and sworn statements throughout the change-of-plea colloquy are "powerful evidence from [Williams] himself that his guilty plea was knowing and voluntary." Winthrop-Redin, 767 F.3d at 1216. In addition, his confession to a Secret Service Agent before he pled guilty, and his statements at the sentencing hearing after he learned about his guidelines sentencing range of life imprisonment, reinforce the conclusion that his guilty plea was knowing and voluntary and was not affected by counsel's alleged misadvice.

Generally, "the allegations of [a § 2255] petitioner accompanied by his own affidavit are insufficient to mandate an evidentiary hearing in the face of a Rule 11 record detailing statements by the petitioner that his plea was not induced by any threats or coercion." Matthews v. United States, 533 F.2d 900, 902 (5th Cir. 1976).[7] "[T]here is a strong presumption that the statements made during the [plea] colloquy are true." United States v. Gonzalez-Mercado, 808 F.2d 796, 800 n.8 (11th Cir. 1987). But this presumption "is not insurmountable." Id. While "[o]rdinarily a defendant will not be heard to refute his testimony given under oath when pleading guilty," "where the defendant

---

[7]    Decisions issued by the former Fifth Circuit Court of Appeals before the close of business on September 30, 1981, are binding in the Eleventh Circuit. Bonner v. City of Prichard, Ala., 661 F.2d 1206, 1207 (11th Cir. 1981) (en banc).

offers specific factual allegations supported by the affidavit of a reliable third person, he is entitled to a hearing on his allegations." <u>United States v. Sanderson</u>, 595 F.2d 1021, 1021 (5th Cir. 1979) (internal citations and footnote omitted); <u>see</u> <u>Riolo</u>, 783 F. App'x at 923.

That is not the case here. To refute his sworn statements at the change-of-plea colloquy, Williams submits only his own self-serving allegations and affidavit. "The fact that [Williams] present[s] only his own affidavit bears on whether the record conclusively shows he is entitled to no relief." <u>Winthrop-Redin</u>, 767 F.3d at 1217 (citing <u>Bryan v. United States</u>, 492 F.2d 775, 780 (5th Cir. 1974) (en banc)). Further, that Williams "waited more than [three] years after he pled guilty, and only after all other avenues for relief from his sentence were exhausted," to complain about counsel's alleged misadvice also bears on whether the record shows he is entitled to no relief. <u>Id.</u>

Plus, Williams's allegations of ineffective assistance are conclusory. For one, he barely acknowledges his sworn statements at the change-of-plea colloquy, where (for example) he assured the Court that nobody had promised him a light sentence in exchange for his guilty plea. He then completely fails to square his current allegations with those prior sworn statements. For another, Williams points to no "contemporaneous evidence to substantiate" his claim that he would not have pled guilty and would have gone to trial but for Ms. Call's alleged misadvice about his sentencing exposure. <u>Lee</u>, 137 S. Ct. at 1967.

If anything, the contemporaneous evidence, such as Williams's pre-plea confession and his statements at the sentencing hearing, reinforce the conclusion that even if counsel had misadvised him, he was not prejudiced under <u>Strickland</u> and <u>Hill</u>. Thus, no evidentiary hearing is warranted.

## IV.   Certificate of Appealability

The undersigned concludes that a certificate of appealability is not warranted. This Court should issue a certificate of appealability only if the petitioner makes "a substantial showing of the denial of a constitutional right." 28 U.S.C. § 2253(c)(2). To make this substantial showing, Williams "must demonstrate that reasonable jurists would find the district court's assessment of the constitutional claims debatable or wrong," <u>Tennard v. Dretke</u>, 542 U.S. 274, 282 (2004) (quoting <u>Slack v. McDaniel</u>, 529 U.S. 473, 484 (2000)), or that "the issues presented were 'adequate to deserve encouragement to proceed further,'" <u>Miller-El v. Cockrell</u>, 537 U.S. 322, 335–36 (2003) (quoting <u>Barefoot v. Estelle</u>, 463 U.S. 880, 893 n.4 (1983)).

When a district court has rejected a petitioner's claims on the merits, the petitioner must demonstrate that reasonable jurists would find the district court's assessment of the claims debatable or wrong. <u>See</u> <u>Slack</u>, 529 U.S. at 484. However, when the district court has rejected a claim on procedural grounds, the petitioner must show that "jurists of reason would find it debatable whether the petition states a valid claim of the denial of a constitutional right and that

jurists of reason would find it debatable whether the district court was correct in its procedural ruling." Id. Upon consideration of the record as a whole, this Court will deny a certificate of appealability.

## V.     Conclusion

Having considered each of Williams's claims, and finding that none warrants relief under 28 U.S.C. § 2255, it is **ORDERED:**

1. Petitioner Michael Eugene Williams Motion Under 28 U.S.C. § 2255 to Vacate, Set Aside, or Correct Sentence (Civ. Doc. 1) is **DENIED**.

2. The Clerk will enter judgment for the United States and against Williams, and close the file.

3. If Williams appeals this Order, the Court denies a certificate of appealability (COA). Because this Court has determined that a COA is not warranted, the Clerk will terminate from the pending motions report any motion to proceed on appeal as a pauper that may be filed. Such termination will serve as a denial of the motion.

**DONE AND ORDERED** at Jacksonville, Florida this 8th day of November, 2022.

**MARCIA MORALES HOWARD**
United States District Judge

lc 19
C:
Counsel and parties of record